# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 11, 2022

Lyle W. Cayce
Clerk

No. 21-20138

Andrew Willey,

*Plaintiff—Appellant*,

*versus*

Harris County District Attorney,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:20-CV-1736

Before Jones, Smith, and Haynes, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Attorney Andrew Willey wants to solicit legal work from already-represented criminal defendants in Harris County. But he fears that would violate a Texas anti-barratry law, so he sued for a preliminary injunction prohibiting the Harris County District Attorney from enforcing that law against him. The district court denied an injunction. Willey appeals, urging that prosecuting him for soliciting work from represented defendants would violate his First Amendment rights to free speech and association. We affirm because Willey has not shown that his claim is likely to succeed.

No. 21-20138

## I.
## A.

Willey is motivated by his belief that appointed criminal defense attorneys in Harris County are pervasively inadequate, largely because they are overburdened. Willey planned to help by representing affected indigent defendants *pro bono*, but solely to challenge their existing attorneys' adequacy. He initially targeted the clients of a frequently-appointed criminal defense attorney in Harris County ("Doe") because Willey believed Doe was especially overburdened.

Willey created two forms to distribute to Doe's clients. The first was titled "Representation Affidavit." Spanning eight pages and seventy-four questions, the document solicited information about Doe's performance. It provided for affiants to express their "wish" that Doe be replaced and to declare, "I cannot afford to hire a different attorney and am stuck with [Doe] merely because I am too poor to afford anyone else."

The second form was titled "Limited Scope Of Representation Agreement." It explained that Willey would not become "undersigned Defendant's attorney of record" or "replace the court-appointed attorney." Instead, Willey's representation would occur only on any "motion for new court-appointed counsel, motion of rehearing as such, and writ(s) of mandamus to enforce such motions." And Willey would not be compensated.

Willey enlisted "volunteer investigators" to identify Doe's appointed clients. With the volunteers' help, he distributed his forms to 22 of Doe's clients. That prompted the families of two of those clients to contact Doe to ask whether he was still their relatives' lawyer. Those inquiries alerted Doe to Willey's activities. Doe notified Harris County District Judge Amy Martin, who was presiding over criminal cases brought against some of the contacted defendants.

No. 21-20138

After two attempts to persuade Willey to stop contacting Doe's appointed clients, Judge Martin convened an "emergency hearing." There, she recounted an earlier conversation with Kermit Johnson, one of the defendants whom Willey had contacted. Judge Martin explained, and Johnson agreed, that Johnson had asked to speak with the court because Willey had visited him in jail. Johnson further agreed that, during Willey's visit, Johnson wasn't "feeling really good," had "memory issues," and had taken psychotropic medication. Johnson did not wish to speak with Willey, but the jail staff forced him to attend the meeting. Then, Willey induced him to sign "some documents," presumably the forms described above. Johnson later asked to see those documents, but Willey refused.

Judge Martin explained that Johnson "has a fairly serious illness" and said, "If whoever interviewed him could not figure out that he was under the influence of psychotropic meds, that person has no business representing indigent criminal defendants." She told Willey it was "a very, very bad idea to continue to try and solicit business, whether paid or unpaid[,] from defendants he knows are represented," particularly by court-appointed attorneys. She promised Johnson that Willey would not contact him again. She warned that if Willey continued his behavior, she would "not be nearly so nice."

Willey eventually promised to stop contacting Doe's clients. He interpreted Judge Martin's comments as a threat that he would face criminal sanctions if he continued soliciting legal work from represented defendants. So, he put his plans "on hold."

## B.

Texas forbids some forms of what it calls "Barratry and Solicitation of Professional Employment."[1] Tex. Penal Code § 38.12 (West 2013).

---

[1] "Barratry" refers to a common-law offense described as "frequently exciting and

3

No. 21-20138

Attorneys may not contact represented parties "with the intent to obtain professional employment" relating to legal representation in "a specific matter." *Id.* § 38.12(d).[2] An attorney may violate Section 38.12(d) even if he seeks no economic benefit. *See id.* So Willey fears that even solicitations directed at limited, *pro bono* representation are forbidden.

Willey brought this pre-enforcement suit[3] against the D.A. and requested preliminary and permanent injunctions forbidding his prosecution under Section 38.12. After a hearing, the district court denied Willey's motion for a preliminary injunction.[4] Willey appeals that denial.

---

stirring up suits and quarrels between his majesty's subjects, either at law or otherwise." 4 WILLIAM BLACKSTONE, COMMENTARIES *133.

[2] More fully, the relevant part of the statute provides,

A person commits an offense if the person: (1) is an attorney . . . and (2) with the intent to obtain professional employment for the person or for another, provides or knowingly permits to be provided to an individual who has not sought the person's employment, legal representation, advice, or care a written communication or a solicitation, including a solicitation in person or by telephone, that . . . (B) concerns a specific matter and relates to legal representation and the person knows or reasonably should know that the person to whom the communication or solicitation is directed is represented by a lawyer in the matter.

TEX. PENAL CODE § 38.12(d) (West 2013).

[3] Though the D.A. never threatened Willey with prosecution, he has standing to seek pre-enforcement review because he faces a credible threat of enforcement. *See Barilla v. City of Hous.*, 13 F.4th 427, 431–32 (5th Cir. 2021); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330–31 (5th Cir. 2020). But that standing limits the scope of his appeal. He may challenge the anti-barratry statute only as it applies to his desired conduct. Our decision should not be construed as passing judgment on the law's constitutionality generally.

[4] Willey first appealed this denial in *Willey v. Harris County District Attorney*, 831 F. App'x 132 (5th Cir. 2020) (per curiam). There, we lacked appellate jurisdiction because the injunction had not yet been denied. *Id.* at 132. Following the district court's refusal, on March 9, 2021, to enjoin the D.A., we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

No. 21-20138

Willey maintains that he is entitled to a preliminary injunction because his desired conduct is protected by the First Amendment. Since his exercise of constitutional rights is restrained, he says he is suffering an irreparable injury, and the balance of equities and the public interest favor injunction. He urges that he is likely to succeed on the merits because Texas has criminalized protected political speech and association, warranting strict constitutional scrutiny. Willey reasons that the law cannot survive strict scrutiny because it is under-inclusive in protecting any compelling state interest.

## II.

We review the denial of a preliminary injunction *de novo* because determining whether "free speech rights have been infringed presents a mixed question of law and fact." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). We apply the familiar standard for assessing the propriety of a preliminary injunction: Willey must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012). We do not reach the last three factors because Willey has not shown substantial likelihood that "the challenged law is incompatible with the First Amendment." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 538 (5th Cir. 2013).

## III.
## A.

Willey says he wishes to offer to represent indigent defendants *pro bono* for religious and political reasons.[5] He thus claims to be "employing

---

[5] Willey has explained that his "Christian faith compels [him] to . . . . seek justice

constitutionally privileged means of expression to secure constitutionally guaranteed civil rights" rather than "procur[ing] remunerative employment."[6] For this appeal, we assume, as do both parties, that application of the anti-barratry law to his conduct must withstand strict constitutional scrutiny. *See In re Primus*, 436 U.S. 412, 432 (1978).[7] Under that standard, the D.A. must prove that the "restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[8]

The Supreme Court has twice applied strict scrutiny to state attempts to restrict non-commercial attorney solicitation. First, in *Button*, 371 U.S. at 434, the Court held it unconstitutional for Virginia to prohibit NAACP lawyers from advising potential litigants of their rights and referring them "to a particular attorney." Virginia failed to demonstrate a compelling interest "in the form of substantive evils flowing from petitioner's activities." *Id.* at 444. Second, in *Primus*, 436 U.S. at 414–21, the Court held it unconstitutional for South Carolina to discipline an attorney for advising a potential litigant that the ACLU would represent her *pro bono*. The state pointed to the "substantive evils of undue influence, overreaching, misrepresentation, invasion of privacy, conflict of interest, and lay interference that potentially

---

for the poor and helpless." In this posture, we work from a limited record. The district court denied the injunction without finding facts. The D.A. assumes the truth of Willey's allegations for this appeal. We do the same. Nothing we say here should be construed as an authoritative holding on the level of constitutional scrutiny that applies to Willey's conduct. That holding must await more rigorous factfinding.

[6] *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 458–59 (1978) (quoting *NAACP v. Button*, 371 U.S. 415, 442 (1963)) (alterations adopted).

[7] In contrast, attorney solicitations for remunerative work are subject only to intermediate scrutiny. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564 (1980).

[8] *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

No. 21-20138

are present in solicitation of prospective clients by lawyers." *Id.* at 426. The Court did not deny that preventing those harms was a compelling interest but explained that the state had to prove that "any of [those] substantive evils . . . were present in this case." *Id.* at 433. The Court was careful not to "foreclose carefully tailored regulation that does not abridge unnecessarily" freedom of speech or association. *Id.* at 439.

*Button* and *Primus* set the table, but neither controls the outcome. The subjects of Willey's solicitations were already represented. That distinction implicates interests different from the anti-solicitation rationales advanced previously.[9] Whether the First Amendment permits a state to criminalize Willey's desired conduct is a question of first impression. *Button* and *Primus* help answer that question by establishing three principles: (1) the work Wil-

---

[9] In both *Button* and *Primus*, the Court relied heavily on the importance of providing potential litigants with representation. *See Button*, 371 U.S. at 434 ("There thus inheres in the statute the gravest danger of smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority."); *id.* at 436 (explaining that the regulation "could well freeze out of existence all such activity on behalf of . . . civil rights"); *Primus*, 436 U.S. at 418 n.9 ("[S]ome measure of solicitation of prospective litigants is necessary in safeguarding the civil liberties of inarticulate, economically disadvantaged individuals who may not be aware of their legal rights and of the availability of legal counsel [and] that the purpose of the ACLU is to advance and defend the cause of civil liberties."). Willey posits that the same interests are implicated here because, without his intervention, criminal defendants in Harris County risk "having their Sixth Amendment right to effective assistance of counsel frozen out of assistance." But that, of course, assumes he is correct about the inadequacy of Harris County's appointed attorneys.

We cannot make that assumption. That would flip on its head the presumption that states act constitutionally. *See Borden's Farm Prods. Co. v. Baldwin*, 293 U.S. 194, 209 (1934) (explaining that there is a presumption of constitutionality for state legislative action). Absent properly raised contrary evidence, we presume state courts have met their constitutional obligation to provide indigent criminal defendants with "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The proper forum for contending otherwise is on direct appeal or collateral attack where the record would permit full assessment.

ley allegedly wishes to do is constitutionally protected speech and association; (2) restrictions on that conduct are strictly scrutinized; but (3) restrictions are permissible where carefully tailored to prevent substantive evils that a state proves are present in a particular case. Restrictions on speech rarely withstand strict scrutiny, but strict scrutiny is not "strict in theory, fatal in fact."[10]

## B.

The D.A. advances three compelling interests to justify the restriction: (1) "preserving the attorney-client relationship from damaging interference," (2) avoiding "unnecessary delays and confusion in court proceedings" resulting from the solicitations, and (3) "reasonable regulation of the legal profession." We address only the state's interest in preserving attorney-client relationships because it sustains application of the anti-barratry statute to Willey's conduct at this preliminary stage.

### 1.

The D.A. fears that Willey's solicitations, combined with his questionnaire and representation agreement, will damage indigent defendants' relationships with their court-appointed counsel. She maintains that Willey confused at least two defendants about who was representing them. We share that concern and conclude that preventing such confusion is a compelling state interest.

Compelling interests rarely "reduce to precise definition." *See Williams-Yulee*, 575 U.S. at 447.[11] The Supreme Court has sometimes de-

---

[10] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring in the judgment)); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).

[11] *See also Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion) (explain-

scribed compelling interests with synonyms such as "interests of the highest order"[12] and "vital state interest[s]."[13] But it has offered no general theory of what makes a state interest "compelling."

We are left to infer the general from the particular. Interests previously held compelling enough to satisfy strict scrutiny include "safeguarding 'public confidence in the fairness and integrity of the nation's elected judges,'"[14] combating terrorism,[15] protecting election integrity,[16] remedying the effects of past unconstitutional race discrimination,[17] and attaining "a diverse student body" in post-secondary education.[18] The question is whether preventing interference with indigent defendants' understanding of their representation belongs on that list.

Texas's proffered interest implicates its constitutional obligations. The state must provide indigent defendants with "reasonably effective assistance" of counsel. *Washington*, 466 U.S. at 687. Solicitation of a client by another attorney threatens an appointed lawyer's ability to provide reason-

---

ing that promoting election integrity is a compelling state interest in part because free and fair elections are part of the "essence of a democratic society" (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964))).

[12] *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

[13] *Williams-Yulee*, 575 U.S. at 445 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)).

[14] *Id.* (quoting *Caperton*, 556 U.S. at 889).

[15] *Holder v. Humanitarian L. Project*, 561 U.S. 1, 29 (2010).

[16] *Burson*, 504 U.S. at 199.

[17] *Freeman v. Pitts*, 503 U.S. 467, 494 (1992).

[18] *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 311–15 (1978) (opinion of Powell, J.). *But see Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 980 F.3d 157 (1st Cir. 2020), *cert. granted*, 2022 WL 199375 (Jan. 24, 2022) (No. 20-1199).

ably effective assistance because it can confuse a defendant about who represents him. A defendant who thinks someone else represents him may not provide his attorney of record with critical information about the case. That can lead to that attorney's failure to pursue evidence or timely raise a key defense. Both can constitute ineffective assistance.[19]

Of course, Texas is not obligated to criminalize attorney solicitations of represented defendants.[20] But that observation does not diminish the importance of the interest Texas serves. States have some latitude to determine the best way to structure the legal process while meeting their constitutional obligations. For instance, in *Williams-Yulee*, 575 U.S. at 448, Florida could have avoided the harms it sought to address with a speech restriction by switching from a partially elected judiciary to an appointed one. But the Court did not compel that choice and instead explained that a "[s]tate's decision to elect its judges does not require it to tolerate" risks that the public will lose confidence in the integrity of its judiciary. *Id.* So too may Texas decide to focus its efforts to provide effective assistance to indigent defendants on establishing a single, unmolested attorney-client relationship. A state may choose to ward off constitutional injuries at the source instead of waiting for them to materialize.

Still, a constitutional obligation is not *ipso facto* a compelling interest.[21]

---

[19] *See, e.g.*, *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) (holding that failure to interview eyewitnesses was ineffective assistance); *Thomas v. Lumpkin*, 995 F.3d 432, 455 (5th Cir. 2021) ("A defense attorney's obligations in a capital case include conducting a thorough investigation into potential mitigating evidence."); *Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 2002) (explaining a requirement for an ineffective-assistance claim based on the failure to raise a defense).

[20] Indeed, according to Willey, Texas is the only state with such a criminal prohibition. But he acknowledges that at least six other states prohibit identical solicitations via their rules of professional conduct.

[21] Some courts have supposed otherwise. *See, e.g.*, *Thomas v. Bright*, 937 F.3d 721,

When relying on constitutional compliance as the source of a compelling interest, the Supreme Court has not stopped at identifying the obligation. Instead, it has balanced the relative importance of the competing interests. For instance, in one line of cases, it held that compliance with the Establishment Clause can justify content-based restrictions on speech, but it cautioned that the same interest may not permit viewpoint discrimination. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112–13 (2001). That distinction can be explained only by the inference that the Court balanced harms and ranked the Establishment Clause more important than the harm caused by content discrimination but less important than that caused by viewpoint discrimination.

The need for balancing further follows from the asserted conflict among constitutional values. It would be arbitrary to say that any constitutional obligation is compelling enough to sustain infringement of any constitutional right. If that were true, the outcome of strict-scrutiny analysis could turn solely on which constitutional value a state initially chooses to give preference to. If two states make opposing choices in the same context, and both are challenged, the cases could come out differently despite implicating the same constitutional conflict.

To avoid such arbitrariness, if there is a true conflict between two con-

---

734 (6th Cir. 2019) ("[A] State's interest in complying with its constitutional obligations is compelling.") (citing *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)). But the Sixth Circuit in *Thomas* held that the challenged action did not survive strict scrutiny for want of narrow tailoring. *Id.* at 737. And the state there failed adequately to press that line of argument. *Id.* at 734. So the Sixth Circuit did not have occasion to thoroughly consider the question. For its part, the Court in *Widmar* merely assumed, as it has done several times, that such an interest would be compelling because it resolved the case other grounds. 454 U.S. at 271–73 (holding that the state policy was based on an inaccurate understanding of the Constitution). The Court has never held that any constitutional obligation is *per se* a compelling interest.

stitutional values such that one must give way to the other, their relative importance must be assessed.[22]  That is why the Supreme Court has sometimes described strict scrutiny as a "balancing test" and a compelling interest as a "subordinating" one, which implies comparative analysis.  *See Emp. Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 882–83 (1990); *NAACP v. Alabama*, 357 U.S. 449, 463 (1958) (citation omitted).  Thus, we must determine whether the state's asserted interest in ensuring indigent defendants reasonably effective assistance of counsel by protecting attorney-client relationships can subordinate the rights to free speech and free association.  We conclude that it can.

The most analogous state interest that has been evaluated by the Supreme Court is that in promoting public confidence in the integrity of the judiciary.  *See Williams-Yulee*, 575 U.S. at 444–48.  A state's compelling interest in the "integrity of its election process" is also relevant.  *See Burson*, 504 U.S. at 199 (quotation omitted).  Those interests share a concern with the fairness and legitimacy of government.  A state has no higher interest.[23]  Little else matters if a state cannot persuade its citizens that it wields legitimate authority.  *See, e.g.*, *Luther v. Borden*, 48 U.S. (1 How.) 1, 34–38 (1849) (recounting the chaos resulting from a dispute about the legitimacy of Rhode Island's post-colonial government).  That is why states have been permitted to limit expression to the extent necessary to ensure that their

---

[22] *Accord Bender v. Williamsport Area Sch. Dist.*, 741 F.2d 538, 559 (3d Cir. 1984), *vacated on other grounds*, 475 U.S. 534 (1986) ("[W]e believe that the appropriate analysis requires weighing the competing interests protected by each constitutional provision, given the specific facts of the case, in order to determine under what circumstances the net benefit which accrues to one of these interests outweighs the net harm done to the other." (emphasis omitted)).

[23] "[I]f the people have no faith in their rulers, there is no standing for the state." Confucius, The Analects XII 7-3 (James Legge trans., Dover Publ'g ed. 1971).

judiciaries are impartial and their elections are free and fair.

The right to effective assistance of counsel has comparable gravity. Such assistance is "fundamental and essential to fair trials" and necessary to produce "just results" in our adversarial system. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963); *Washington*, 466 U.S. at 685. If attorney solicitation impedes effective assistance as previously discussed, a case may be adjudicated following an incomplete consideration of the merits of the charge. Even if that error is ultimately corrected on review, courts' ability to do justice is undermined in public perception and reality.

So Texas's interest is ultimately about the fairness of its criminal adjudications. That interest ranks alongside the others concerning a state's ability to ensure the legitimacy of its coercive authority. Since those interests are of a piece, we need not independently balance Texas's asserted interest against Willey's First Amendment rights. The Supreme Court has already determined that such interests can subordinate freedom of speech if necessary. *See Williams-Yulee*, 575 U.S. at 448; *Burson*, 198–99.

It follows that the asserted state interest here is similarly subordinating. It may sustain application of the anti-barratry law to Willey's conduct if the law is narrowly tailored to its end.

2.

A speech restriction is narrowly tailored to a compelling state interest where it does no more "than is necessary to further" the interest. *Knowles v. City of Waco*, 462 F.3d 430, 435 (5th Cir. 2006) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989)). The "essence of narrow tailoring" is to "focus[ ] on the source of the evils the [government] seeks to eliminate . . . without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward*, 491 U.S. at 799 n.7. Here, the anti-barratry law must not go further than necessary to

prevent indigent criminal defendants from being confused about who represents them.

A narrowly tailored restriction must also advance the asserted interest well enough to prove that the interest is genuine and not a *post hoc* rationalization. Defects of that type are termed "under-inclusivity." The Supreme Court has often found under-inclusivity antithetical to narrow tailoring.[24] Nonetheless, under-inclusivity is not *per se* fatal under strict scrutiny. *Williams-Yulee*, 575 U.S. at 448–50. After all, it is odd to suggest that a First Amendment defect might be cured by restricting more speech. *Id.* at 448. So it is not enough to point out that a state did not "address all aspects of a problem in one fell swoop." *Id.* at 449. Instead, under-inclusivity tests the sincerity of the state's interest. We ask whether the restriction is "riddled with exceptions" or "so woefully underinclusive as to render belief in [its stated] purpose a challenge to the credulous." *Id.*; *White*, 536 U.S. at 780.

Under-inclusivity is the principal ground on which Willey attacks the anti-barratry statute. He finds it under-inclusive in two ways. *First*, he says the portion of the statute that could be applied to his conduct can proscribe only true speech—that is, solicitation of represented clients based on the inadequacy of their appointed attorney when that attorney truly is inadequate. Thus, Willey reasons that the statute serves no legitimate state interest. *Second*, Willey posits that attorney-client relationships can be harmed in myriad ways that aren't covered by the statute. Attorneys can say anything they like to damage the same relationships so long as they do not "seek to become [a defendant's] lawyer in the matter in which they are represented."

---

[24] *See, e.g.*, *Republican Party v. White*, 536 U.S. 765, 780 (2002); *Lukumi*, 508 U.S. at 543–546; *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 800–802 (2011); *Citizens United v. FEC*, 558 U.S. 310, 362 (2010); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2357 (2020) (Sotomayor, J., concurring in the judgment).

No. 21-20138

Addressing Willey's first argument requires statutory explication. Section 38.12(d) prohibits six types of actions by attorneys and other licensed professionals. On top of the prohibition on solicitation for legal services that is directly relevant here,[25] it forbids communications that "involve[ ] coercion, duress, fraud, overreaching, harassment, intimidation, or undue influence"[26] or "contain[ ] a false, fraudulent, misleading, deceptive, or unfair statement or claim."[27] Like the anti-solicitation provision, these prohibitions apply to any action intended to "obtain professional employment," even if not for profit. *Id.* § 38.12(d)(2).

Willey thus tries to characterize the anti-solicitation provision as surplusage *vis-à-vis* the state's interest in protecting attorney-client relationships. He divides attorneys' hypothetical statements to represented parties into two categories: "potentially false statements" and "potentially true statements." He reasons that any "potentially false statement" is already covered by Sections (d)(2)(E) and (F) because it would be, for instance, misleading, fraudulent, or overreaching. So he concludes that the only independent force of the anti-solicitation provision is to prohibit "potentially true statements." He says a state has no legitimate interest in foreclosing attempts to terminate deficient representation.

That dichotomy is way off the mark. For one thing, "potentially false" and "potentially true" mean more or less the same thing in this context. Willey's equivocation about the truth of these hypothetical statements arises from the indeterminacy of whether representation is adequate. In *Washington*, 466 U.S. at 687–89, the Court adopted a consciously vague

---

[25] Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 38.12(d)(2)(B) (West 2013).

[26] *Id.* § 38.12(d)(2)(E).

[27] *Id.* § 38.12(d)(2)(F).

No. 21-20138

"reasonableness" standard, stating that "[m]ore specific guidelines [were] not appropriate" because the inquiry requires a consideration of "all the circumstances." Whenever all circumstances must be considered, reasonable minds will differ. One lawyer may genuinely believe that another has rendered inadequate assistance and say so, honestly and without exerting undue influence or overreaching, even where courts and other lawyers would disagree—especially if that lawyer is predisposed to see the specter of inadequacy.

For that reason, anything concerning a statement's truth or falsity is a poor lens through which to view the state's interest. Willey neglects to consider that Texas is legitimately interested in forbidding attorney solicitation of represented parties even where lawyers do not consciously coerce or mislead. If that is true, the anti-solicitation provision is not duplicative, as Willey claims. That leads to his second argument.

Willey is right that attorneys can say anything they like to represented clients without violating the anti-solicitation provision so long as they do not "seek to become their lawyer in the matter in which they are represented." That could mean an attorney is free to opine that a represented party's lawyer is constitutionally inadequate, provided that attorney does not run afoul of the anti-fraud and anti-coercion provisions. But characterizing that as underinclusivity misapprehends the nature of the state's interest.

The state's interest is in preventing *confusion* that damages relationships between appointed counsel and indigent defendants. The potential for confusion is uniquely present where an attorney approaches a represented defendant and offers to become his lawyer, even for a limited purpose. If, as Willey suggests, an attorney merely "approach[es] represented defendants and explain[s] to them the deficiencies of their current lawyers," those defendants are likely to raise those concerns with their current lawyers or a court.

That would do little or no harm. But if Willey induces them to sign forms filled with legalese, including one titled "Limited Scope of Representation Agreement," they likely will think he represents them generally and may withhold vital information from their counsel of record, leading to the harms already described.

No matter how carefully drafted, Willey's language limiting the scope of his representation is not likely to be communicated adequately to each of the recipients of his solicitations. Those untrained as lawyers may fail to appreciate the difference between "writ(s) of mandamus to enforce such motions" and other forms of representation. All they are likely to hear is that their old lawyer was no good, so they have a new one.

That is not conjecture. As *Primus* requires, the state has demonstrated, as far as possible at this preliminary stage, that Willey's conduct caused that precise type of confusion.[28] Family members of two of the twenty-two defendants whom Willey contacted were confused about whether Doe still represented them. Willey provided his forms to Kermit Johnson against his will, in jail, late at night, while he was struggling with mental illness and under the influence of psychotropic medication. It is hard to think of a better way to confuse a defendant about who represents him.

Willey would have us draw a different conclusion from these facts. At oral argument, his counsel suggested that at least one criminal defendant was confused "because he never hears from his lawyer," not because of Willey's actions.[29] In other words, he says any confusion was Doe's fault, not Willey's. That is not supported by the record: It would not explain why every-

---

[28] *Primus*, 436 U.S. at 433 (explaining that a state must prove that the "substantive evils" it fears are "present in this case").

[29] Oral Argument at 33:49.

one involved immediately connected the defendants' confusion with Willey or why the families contacted Doe only after Willey's solicitations.[30] And it entirely ignores Willey's conduct involving Kermit Johnson, whose confusion couldn't possibly be attributed to Doe. But likelihood is all we can judge at this preliminary stage and on this record. It will be for the district court to find facts in the first instance and for the D.A. ultimately to prove that Willey's actions caused confusion.

If that view of the facts is borne out, prohibiting Willey's conduct precisely addresses the state's compelling interest. There is a special harm created where an attorney solicits work relating to a particular legal matter and the subject of the solicitation already has an attorney—all the more so if the subject is especially vulnerable to confusion. That harm is not created by merely expressing an opinion about a defendant's current lawyer. Hence, the anti-barratry law Willey challenges is the "essence of narrow tailoring" as it relates to the state's compelling interest in protecting relationships between indigent defendants and appointed counsel. *Ward*, 491 U.S. at 799 n.7. It prevents exactly the targeted harm with no exceptions or carve-outs.

In sum, because the anti-barratry law is likely narrowly tailored to a compelling government interest implicated by Willey's conduct, Willey has not shown that he is likely to succeed on the merits of his First Amendment claim. We therefore decline preliminarily to enjoin the D.A. from enforcing the statute against him.

---

[30] Willey's counsel stated at oral argument that one impacted defendant sent "thirty-three *pro se* letters to the court." *Id.* Those letters are not in the record on appeal, so we cannot determine their content. But there is no indication that the letters asked about the identity of that defendant's attorney. A defendant may write a letter to a court for any number of reasons. In any event, they were addressed *to the court*, not to Doe. No one involved in this case appears to have asked Doe whether he still represented them until that person had heard from Willey.

No. 21-20138

IV.

Finally, Willey asks us to assign this case to a different district judge on remand. During a hearing on the request for a preliminary injunction, the district judge erroneously referred to Willey's organization Restoring Justice as a "defunct charity" and asked several questions about the organization and its tax status, even though it was not a party. Evidently, the judge confused Restoring Justice with another organization called "Restore Justice." Willey calls that an "improper inquiry" and a "fixation on the tax compliance of the wrong non-profit," which the judge never indicated would be set aside.

Judges must be disqualified "in any proceeding in which [their] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). And appellate courts may reassign cases to a different judge on remand under their authority to "require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106; *Liteky v. United States*, 510 U.S. 540, 554 (1994). But reassignment is an "extraordinary" and "rarely invoked" power. *In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002) (quoting *Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997)).

We have used two independent tests to decide whether to reassign. The first test considers three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 700–01. The second test is whether the facts "might reasonably cause

19

an objective observer to question the judge's impartiality."[31]  The tests are "redundan[t]" because "the second factor of the first test is virtually identical to the single question the simpler test asks," and "[t]he result of each test has been always the same." *United States v. Khan*, 997 F.3d 242, 249 n.4 (5th Cir. 2021).

This case does not merit reassignment under either test.  The district court's mistake does not manifest bias to an objective observer because there were legitimate reasons to ask about Restoring Justice, which is mentioned six times in Willey's complaint.  And there was discussion in the record about whether Willey might evade his agreement with Doe by resuming his activities under the name of Restoring Justice.  It was justifiable to ask about which parties were properly before the court, the relationships between them, and their legal capacities to act.

Willey further reasons that the district judge must have been intentionally "searching for potentially negative information" to unearth anything about Restore Justice's tax compliance.  That is unduly speculative.  We have no information in the record about how the judge found the information.  We will not assume the worst, nor would an objective observer.[32]

Finally, there is no reason to think the district judge will "have substantial difficulty in putting [this] out of his . . . mind."  *DaimlerChrysler*, 294 F.3d at 700.  It is now clear that Restoring Justice is not defunct, facing tax difficulties, or a party to this case.  We expect this issue to have no bearing

---

[31] *DaimlerChrysler*, 294 F.3d at 701 (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995) (alteration adopted)).

[32] We express no opinion about the permissibility of judges' using the internet to learn about the parties before them.  Doing so would be inappropriate on this record.  We conclude only that Willey's accusations are too speculative to support reassignment.

No. 21-20138

whatsoever on further proceedings.

Accordingly, the orders denying the preliminary injunction and the recusal of the district judge are AFFIRMED. The case remains in the district court for further proceedings, which may now resume.

No. 21-20138

EDITH H. JONES, *Circuit Judge*, concurring:

In this as-applied challenge, we are called upon to determine only whether Texas's criminal anti-barratry statute may constitutionally be applied to Willey's conduct as described. I think it can, and therefore concur in the judgment and in the majority's narrow tailoring analysis. With respect to the state's compelling interest, the state and the public have a grave interest and constitutional duty to provide free defense counsel to indigent criminal defendants. *Gideon v. Wainwright*, 372 U.S. 335, 339-340, 83 S. Ct. 792, 794 (1963) (citations omitted).[1] On the facts here alleged, it appears that Willey undertook deliberately to interfere with a particular court-appointed attorney's representation of multiple clients. It is also clear that several clients or their families were unnerved and confused by his intrusive inquiries about the appointed attorney's representation. The state court properly indicated concern as to whether, *inter alia*, Willey had caused the defendants to reveal attorney-client confidences or, contrarily, had caused the defendants to resist full cooperation with appointed counsel. Either way, and at least for these reasons, the state has a compelling interest in sanctioning Willey's "speech" that not only had a tendency but, as pled, actually did interfere with the attorney-client relationship provided to these defendants. As this record stands, Willey has not shown a likelihood of success on the merits.

---

[1] One need not resort to Confucius to understand the importance of our government's operating a criminal justice system that accords defendants due process of law as interpreted in numerous court decisions.