# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 6, 2021

Lyle W. Cayce
Clerk

No. 20-20030

United States of America,

*Plaintiff—Appellant*,

*versus*

Asher Abid Khan,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CR-263-1

Before Jolly, Stewart, and Oldham, *Circuit Judges*.

E. Grady Jolly, *Circuit Judge*:

In this appeal, we are asked to assess the substantive reasonableness of a below-Guidelines sentence for a defendant who pled guilty to a terrorism charge. This review is the second occasion that this defendant's sentence has been appealed to this court. *United States v. Khan*, 938 F.3d 713 (5th Cir. 2019) ("*Khan I*"). Because the district court did not account for a sentencing factor that should have received significant weight, we reverse the defendant's sentence as substantively unreasonable and remand for a second resentencing. And because the sentencing judge seems immovable from his views of the sentence he imposed, and because the judge displayed bias

No. 20-20030

against the government and its lawyers, we *sua sponte* reassign this case to a different judge.

## I.

Asher Abid Khan, originally from Houston, moved to Australia at age nineteen. *Khan I*, 938 F.3d at 714.[1] A Muslim, Khan increasingly became radicalized through viewing and discussing jihadist propaganda on the internet. He had decided to move to the Middle East to join ISIS. *Id.* Around the same time, he got back in touch via Facebook with Sixto Ramiro Garcia, whom he had known from the mosque they had attended in Houston.[2] Garcia accepted Khan's Facebook friend request on January 6, 2014, and that same day, the two began messaging back and forth. Khan said that he was planning to travel to join ISIS in Syria and invited Garcia to come along with him. Soon they began discussing the travel documents required. Khan also told Garcia he would send him lectures on "fighting for Islam." Garcia said that he wanted to travel with Khan to the Middle East to join ISIS.

Khan then contacted Mohamed Zuhbi, a member of ISIS who lived in Turkey and coordinated travel for ISIS recruits. *Id.* Zuhbi stated he could help Khan once he had firm plans in place to get to Turkey. Khan and Garcia thus began to solidify their scheme and continued to discuss logistics and their jihadist views. Khan then sought further guidance from Zuhbi. Zuhbi encouraged Khan to fly to Istanbul from Australia (where Khan was then living), take a bus to Antakya near the Syrian border, and meet Zuhbi in Antakya. Zuhbi also gave Khan his phone number and told him to buy a

---

[1] The facts of this case are ably laid out in our prior opinion and will only be briefly supplemented as necessary here. *See Khan I*, 938 F.3d at 714–15.

[2] By the time they reconnected, Khan had moved to Australia to live with relatives and continue his education. *Id.*

No. 20-20030

burner phone and SIM card upon arrival in Turkey. Khan relayed this plan to Garcia and also gave him instructions on purchasing a one-way ticket from Houston to Istanbul. They also discussed their cover story that they were tourists.

About a month and a half after Khan and Garcia first reconnected online, both flew to Turkey and met in person. Their plan to travel together to meet Zuhbi, however, was frustrated by Khan's family. After Khan had told them his plans to join ISIS, his family—who still lived in Houston—lied to him that his mother had suffered a heart attack, that death was at the door, and that he needed to immediately fly to Houston before she died. Garcia attempted to convince Khan to continue with him to Syria, but Khan refused. Instead, he provided Garcia with Zuhbi's phone number and cash for his trip to Syria. Khan then flew to Houston.

The next day, Garcia messaged Khan telling him that the phone number he had given him for Zuhbi did not work. Khan proceeded to message Zuhbi about Garcia, and that day, Garcia and Zuhbi made direct contact, messaging each other about when and where to meet. The next day, Garcia messaged Khan that he had met with Zuhbi but was not yet with ISIS.

Although Khan was now in Houston, he and Garcia continued to message each other over the next few months, with Garcia updating Khan as he progressed through some form of boot camp, received an AK-47, and was involved in a skirmish. Khan offered several times to provide Garcia money if he needed it, and he also posted on Facebook in an attempt to raise funds for Zuhbi. In July 2014, Khan advised Garcia that he should try to join ISIS, as Garcia appeared to have joined a different militia. About a month later, Garcia confirmed that he was fighting for ISIS. In September 2014, all communications with Garcia went dead, and in December of the same year, Garcia's mother received a Facebook message from someone using Garcia's

account saying that he was believed to have died in Iraq while fighting for ISIS.

Back to Houston: Khan was arrested in May 2015 and indicted in the Southern District of Texas. He pled guilty before Judge Lynn Hughes to providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B on December 4, 2017. At sentencing, the judge took issue with the prosecutors' attempt to include U.S.S.G. § 3A1.4's terrorism enhancement in Khan's sentencing guideline calculations and refused to include the enhancement. The judge also overruled prosecutors' request to apply U.S.S.G. § 2M5.3(b)(1)(E) to Khan because he declined to find that that Khan's contact with Garcia qualified as "material support" to "commit or assist in the commission of a violent act." The government objected to these rulings and argued that a 180-month sentence was necessary to deter others from joining ISIS or recruiting others to join ISIS. Khan, through counsel, asked for a 12-month sentence. He argued that he was young and stupid, had left the jihadist world behind, and now was working, studying, and volunteering to educate others about the dangers of radical jihadism. The court, noting that Khan's crime was "helping a friend do what you were doing," sentenced Khan to 18 months in prison and 3 years of supervised release.

The government appealed. *Khan I*, 938 F.3d at 713. This court, after reviewing the district court's application of the guidelines de novo and its factual findings for clear error, determined that the district court's sentence was procedurally unreasonable for concluding that the terrorism enhancement did not apply. *Id.* at 717–19. It did not reach the issue of the

sentence's substantive reasonableness or whether the § 2M5.3(b)(1)(E) enhancement should apply. *Id.* at 714.

At resentencing upon remand, the government again sought a 180-month sentence, which was the statutory maximum. Khan asked the court to reimpose the same sentence as before, given that he had already served his prison time without disciplinary issues and was continuing his education; he also was volunteering with a Department of Homeland Security-sponsored program to train community leaders to recognize signs that a young person might be susceptible to extremism or gang recruitment. Khan's youth was again emphasized.

Judge Hughes then sentenced Khan to the same 18-month sentence, but with more explanation than earlier. After finding the terrorism enhancement applicable, the judge stated on the record that there were reasons to depart downward. Khan's lack of criminal history, studies, work, volunteering, steps toward rehabilitation, and age were all reasons to decrease the sentence. The judge also found that Garcia "was not recruited" by Khan; instead, they were "equally enthusiastic" about it, "both wanted to do it," and "encouraged each other." The fact that Khan now had friends and family that were good influences on him was also important to the court. In addition, the judge noted that Khan spoke with law enforcement after his guilty plea in an attempt to cooperate with them. Judge Hughes also found that Khan didn't "need a lot of retribution because what he did do was so miniscule," and he questioned the materiality of the support that Khan provided. To the judge, there was no "reason to further protect the public" from Khan's crimes. Khan's attorney asked that the court note that part of its decision was based on a policy disagreement with the sentencing guidelines calculations, which the judge affirmed. The government objected to Khan's sentence, this time as being substantively unreasonable, and this appeal followed.

## II.

"We review a preserved objection to a sentence's substantive reasonableness for an abuse of discretion, examining the totality of the circumstances." *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013). "A district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States v. Teuschler*, 689 F.3d 397, 399 (5th Cir. 2012). Errors of law are reviewed de novo, but factual findings must only be "plausible," *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008), and are not clearly erroneous unless—viewing the record as a whole—this court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Hebert*, 813 F.3d 551, 559 (5th Cir. 2015).

District courts must consider the seven sentencing factors found in 18 U.S.C. § 3553(a) in the light of the parties' arguments for a sentence to be substantively reasonable. *United States v. Mondragon-Santiago*, 564 F.3d 357, 360–61 (5th Cir. 2009); *United States v. Williams*, 517 F.3d 801, 809–10 (5th Cir. 2008). After selecting a sentence, the district court must adequately explain it; if the court choses to vary from the Guidelines, it must "more thoroughly articulate its reasons," which should be "fact-specific and consistent" with the § 3553(a) sentencing factors. *Hebert*, 813 F.3d at 562. The further a sentence varies from the Guidelines, the more compelling the justification must be, but a "significant variance" from the Guidelines is allowed where it reflects the district court's individualized, case-specific reasons. *United States v. Nguyen*, 854 F.3d 276, 283 (5th Cir. 2017); *Hebert*, 813 F.3d at 562–63. "The fact that this court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal," *Nguyen*, 854 F.3d at 283, and even a sentence "significantly outside the Guidelines range" is reviewed under this "highly deferential"

abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 41 (2007); *United States v. Hoffman*, 901 F.3d 523, 554 (5th Cir. 2018).

Notwithstanding this level of deference, however, a sentence is substantively unreasonable if it "does not account for a factor that should have received significant weight" or "represents a clear error of judgment in balancing the sentencing factors." *Warren*, 720 F.3d at 332. We proceed to review Khan's sentence to determine whether it is laden with the errors alleged by the government.

## III.

We first address whether the sentence failed to give "significant weight" to the seriousness of Khan's offense. *See* 18 U.S.C. § 3553(a)(2)(A).[3] This sentencing factor, which must be taken into account, requires a judge to impose a sentence that "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Here, Khan specifically pled guilty to providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). *Khan I*, 938 F.3d at 715.

In his plea agreement, Khan explicitly agreed that the material support he provided to ISIS included personnel: his friend, Garcia. Furthermore, Khan unequivocally agreed to a set of facts that formed the basis of his guilty plea. In particular, Khan agreed to the fact that he "began recruiting" Garcia to join ISIS; that while Khan and Garcia were planning to travel to Turkey, "it was Khan, not [Garcia], who was in touch with [Zuhbi]" to coordinate

---

[3] This sentencing factor overlaps substantially with § 3553(a)(1)'s requirement for judges to consider the "nature and circumstances of the offense," so any discussion of § 3553(a)(2)(A) applies equally to § 3553(a)(1) as well.

their connection to ISIS; and that even after returning to Houston—and shortly before Garcia's apparent death—Khan "told [Garcia], who had yet to reach [ISIS], that [Garcia] should still try to get to [ISIS]."

Throughout the resentencing hearing, the judge sought to minimize Khan's actions, ignoring if not contradicting the facts to which Khan and the government had agreed and which formed the basis of his plea. Judge Hughes stated that Garcia "was not recruited" by Khan, that Khan and Garcia were "equally enthusiastic" about joining ISIS, and that they "encouraged each other." But the record and Khan's plea agreement make abundantly clear that Khan played a singular role in planning their travel to Turkey and was a necessary link in connecting Garcia to ISIS. Indeed, as we have noted, Khan agreed that the material support he provided to ISIS was his friend, Garcia. Judge Hughes minimized Khan's material support as "what money he had left over" and "traveling with [Garcia] and then giving him a phone number when he bailed out" and seemed to brush aside the facts that demonstrated the seriousness of Khan's actions.

In addition, Judge Hughes omitted any discussion of Khan's behavior after returning from Turkey into his assessment of the seriousness of Khan's crime. He stated that when Khan "returned and was apprehended, he had already gone back to his normal life," despite the fact that Khan pled guilty to continuing to encourage Garcia's quest to join ISIS even after he returned to Houston. Khan did not just "talk about Jihadism," "[buy] a plane ticket," "[make] some cell phone calls," and then "quit before it started." He played an active role in pushing Garcia along a path that ended in his death.

The judge's comments also downplayed the nature of what Khan and Garcia intended to accomplish. At sentencing, the judge referred to Khan's conduct as "miniscule" and "as low level and as least significant as I think you could have." Although the judge certainly acknowledged that ISIS has a

"despicable, inhumane purpose," he opined that Khan and Garcia's association was "no different than two guys signing up for the Marines."

To the point, the judge characterized and discounted Khan's conduct effectively so as to contradict the facts Khan admitted in his plea agreement. Furthermore, he failed to acknowledge that Khan had facilitated and fully supported the purposes and atrocities of ISIS. We conclude that Judge Hughes failed to account for the "seriousness of [Khan's] offense," a sentencing factor that should have received "significant weight." *See* 18 U.S.C. § 3553(a)(2)(A); *Warren*, 720 F.3d at 332. Khan's sentence was thus substantively unreasonable; it is reversed, and we will remand.

## IV.

Finally, we find that upon remand, reassignment of this case is appropriate. *See Johnson v. Sawyer*, 120 F.3d 1307, 1333 (5th Cir. 1997) (noting that we have the power, on remand, to reassign a case to another judge). Although reassignment is an "extraordinary" power that is "rarely" invoked, we find it warranted here based on the two separate, but related tests this court has applied to in the reassignment context.[4] *Miller*, 986 F.3d at 892–93.

---

[4] "This Circuit has not decided which of [these] two tests should be used to decide whether to reassign a case." *United States v. Winters*, 174 F.3d 478, 487 (5th Cir. 1999). Instead, we use both tests, which are borrowed from other circuits. *Id.* The result of each test has been always the same. *See, e.g.*, *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 892–93 (5th Cir. 2021); *U.S. ex rel. Little v. Shell Expl., Prod. Co.*, 602 F. App'x 959, 975 (5th Cir. 2015); *Latiolais v. Cravins*, 574 F. App'x 429, 437 (5th Cir. 2014); *In re DaimlerChrysler Corp.*, 294 F.3d 697, 701 (5th Cir. 2002); *Winters*, 174 F.3d at 487–88; *Johnson*, 120 F.3d at 1333. We do note that the second factor of the first test is virtually identical to the single question the simpler test asks. Since these two inquiries suggest redundancy, we have analyzed them together here.

What we call the first test involves weighing three factors: "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected"; "(2) whether reassignment is advisable to preserve the appearance of justice"; and "(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* What we will call the second test simply requires this Court to reassign "when the facts might reasonably cause an objective observer to question [the judge's] impartiality." *In re DaimlerChrysler Corp.*, 294 F.3d at 701.

Addressing the first test, the record convinces us that the judge would likely have substantial difficulty putting out of his mind his previously expressed views. He had first sentenced Khan to 18 months; and when we reversed, on remand he seemed determined to fashion the record to his own choosing, in order to once again impose the same sentence. It is clear that he is fixed in his view of what Khan's sentence must be. And although on remand he did acknowledge the sentencing enhancement as mandated, he declined to reconsider the sentence in any respect, showing that he is adamant against further consideration of the substance of the record.[5]

The first test's second factor asks us to examine whether the appearance of justice has been compromised by the sentencing process. This factor aligns with the question posed by the second test: whether the facts

---

[5] *See*, *e.g.*, *Little*, 602 F. App'x at 974 (a case in which Judge Hughes ignored this court's instructions after an appeal, resulting in a second appeal, upon which this court reassigned the case to a different judge).

might "reasonably cause an objective observer" to question the judge's impartiality.

Judge Hughes did not show impermissible bias against the government or its attorneys at the resentencing hearing itself. To be sure, at the end of the hearing, he specifically stated to the government attorney, "You understand [the sentence] is no reflection on you?" To which the prosecutor replied, "Yes, I do, Your Honor." But a further look shows that the judge packed the record with hostile remarks against the government and its attorneys. He repeatedly indicated that government attorneys, especially those from Washington, are lazy, useless, unintelligent, or arrogant.[6] At times, these same sorts of comments were directed at the particular government attorneys appearing before him.[7] What's more, he compared the government with ISIS, referred to its attorneys as "thugs," and alluded to the Department of Justice as unethical.[8] These sorts of comments do

---

[6] *E.g.*: "[Government attorneys in Washington] are back from lunch now. It is 1:00 in Washington, and they are only going to work until about 3:30. . . . The government has to learn to act." | "You know how many people have civilian jobs with the United States government? . . . The short answer would be 'too many.'" | "[T]he government can appeal the sentence, and it's been known to do irrational things like that." | "[S]end some 30-year-old chip-on-the-shoulder jerk down here [from Washington] to do it for you." | "It's the typical Washington mentality. They are so self-absorbed." | "[T]here are too many self-important retarded—I take that back; retarded people have a justification—who like nothing better than a headline that they can announce they're going to get somebody, whether they . . . have a case or not." | "[O]rdinary routine stuff does not get done because we're spending all our resources with people like Eric Holder at a podium holding press conferences on people he's going to crush. . . . Those people ought to go get a shovel or a hoe and report to the nearest national park and start cleaning up paths."

[7] *E.g.*: "Come in and do your job[.]" | "I know you-all are useless government bureaucrats[.]" | "[I]t's not that you're annoying me, which you are—apparently, it's what you-all do."

[8] *E.g.*: "You work for the government whose principal product is press releases, so don't be talking about [ISIS's] extravagant media. . . . One must be careful about pointing fingers." | "So, we know there's a terror problem everywhere. And some of the citizen

reveal a level of prejudice—not just skepticism—against the government as a party in this case.

Finally, the third factor asks us to consider whether reassigning this case to another judge would entail waste and duplication out of proportion to any gain in the appearance of fairness. This factor counsels caution. We certainly recognize that Judge Hughes has been presiding over this case for four-and-a-half years, which included seven conferences and hearings, and that a different judge would have to get up-to-speed on a substantial and nuanced factual record. In this respect, reassignment is regrettable; it is nonetheless necessary for the reasons we have stated.

## V.

In this, the second appeal of this case, we have examined the substantive reasonableness of a defendant's sentence and have explained why, in view of the record, it cannot stand and must be vacated. We have further considered reassignment and have concluded that because of the judge's fixed and inflexible view of the case—and his statements evincing bias against the government as a party—the case requires reassignment to a new judge. Consequently, we REVERSE Khan's sentence, VACATE the judgment, and REMAND this case to the Chief Judge of the Southern District of Texas to REASSIGN it to a different judge, who will proceed in a manner not inconsistent with this opinion.

REVERSED, VACATED, REMANDED, and REASSIGNED.

---

voters out there might say there might be a governmental problem, too." | "I could write a whole book with nothing but governmental abuse. Not all of it is the Justice Department. EPA and the Securities and Exchange Commission have their blue-suited thugs, too." | "The phrase 'public integrity' in connection with the Justice Department is a contradiction."