RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

MIRSAD RAMIC,

       *Defendant-Appellant/Cross-Appellee*.

Nos. 25-5392/5471

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:21-cr-00013-1—Gregory N. Stivers, District Judge.

Argued: April 30, 2026

Decided and Filed: May 13, 2026

Before: GIBBONS, THAPAR, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Joshua M. Reho, WESTERN KENTUCKY FEDERAL COMMUNITY DEFENDER, INC., Louisville, Kentucky for Mirsad Ramic. Amanda E. Gregory, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for the United States. **ON BRIEF:** Frank W. Heft, Jr., Scott T. Wendelsdorf, OFFICE OF THE FEDERAL DEFENDER, Louisville, Kentucky, for Mirsad Ramic. Amanda E. Gregory, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for the United States.

───────────────

## OPINION

───────────────

THAPAR, Circuit Judge. Over a decade ago, a new wave of terrorism spread across the Middle East. A group calling itself the Islamic State of Iraq and Syria (ISIS) sought to establish

a new regime strictly governed by Islamic law. To do so, ISIS employed brutal tactics—planting bombs, publicly decapitating its enemies, burning people alive, and enslaving women and children. It also launched vicious attacks to conquer territory in Iraq and Syria. And it recruited fighters from around the world to perform these acts of terrorism.

Mirsad Ramic was one such fighter. He traveled from the United States to Syria, where he participated in an attack that claimed over 100,000 lives. The United States eventually prosecuted him for providing material support to a terrorist group and receiving military-type training from that group. For those crimes, Ramic faced an advisory sentence of 360 to 600 months' imprisonment under the Sentencing Guidelines. But the district court sentenced Ramic to only 101 months in prison. Because the district court's substantial variance is substantively unreasonable, we vacate his sentence and remand for resentencing.

I.

Mirsad Ramic grew up in Bosnia during a civil war. That conflict involved genocide and war crimes targeted at minority groups, including Bosnian Muslims like Ramic and his family. In fact, Ramic's father was killed during this conflict. So once the war concluded, the United States offered Ramic and his family a fresh start by granting them refugee status. Ramic's family ultimately settled in Bowling Green, Kentucky, a city with a vibrant population of other Bosnian refugees. Eventually, Ramic became a naturalized U.S. citizen, but he was unhappy with his American life.

Rather than embracing the privilege of American citizenship, Ramic embraced the extremist views of terrorist groups trying to destroy the United States and its allies. During his naturalization ceremony, Ramic refused to recite the oath of allegiance to the United States. Instead, he proclaimed an Islamic oath and cursed all nonbelievers.

Less than a year later, Ramic attempted to travel to the Middle East and join a terrorist group. First, he tried traveling to Yemen, claiming that he wanted to enroll in a religious school there. But he didn't have a student visa, so Yemeni authorities denied him entry.

This trip raised the suspicions of American law enforcement, leading FBI agents to question Ramic several times about the reason for his travel. Ramic insisted that he simply wanted to engage in religious study. But the agents didn't believe him. Instead, they thought he was being radicalized and wanted to join terrorist groups engaged in jihad—which, in the terrorism context, means a religious holy war against those who don't believe in Islam. The federal agents were right to be suspicious: Ramic later admitted that he had lied about why he traveled to Yemen. But they took no action at the time.

Neither the FBI interviews nor his failed attempt to join a jihadist group deterred Ramic. He then joined an online chat service to connect with other supporters of terrorism. In those chats, Ramic discussed his continued desire to travel to Muslim countries. And he urged others to do the same by obtaining student visas to study Arabic. Ramic followed his own advice and twice applied to study at a university in Saudi Arabia. He tried to secure a student visa to travel there, but that plan never came to fruition.

Around this time, ISIS began gaining power in the Middle East. It aimed to establish a global empire with strict enforcement of Islamic law. It started by conquering large swaths of territory in Syria and Iraq. In doing so, ISIS used ruthless tactics, such as public executions, enslavement, and car bombings that targeted civilians. For example, ISIS publicly murdered journalists to demonstrate the consequences of dissent. And ISIS's reign of terror wasn't limited to Iraq and Syria. ISIS launched attacks around the world, including in France and Belgium. In response, the United States designated ISIS as a foreign terrorist organization in 2014 and led an international effort to combat this growing threat. ISIS also declared the United States an enemy and urged its followers to attack the United States and its interests.

One such follower was Abdullah el-Faisal. Faisal was a Jamaican Muslim cleric who had previously been convicted in the United Kingdom of advocating for the murder of Jews, Hindus, Christians, and Americans. When ISIS started gaining traction, Faisal began recruiting for the group and urged his supporters to launch violent jihadist attacks. He instructed his followers on how to covertly travel to Syria or Iraq to join ISIS. Ramic consumed this radical propaganda and soon ascended to Faisal's inner circle, becoming one of the few people trusted to directly raise money on Faisal's behalf.

Ramic then put Faisal's instructions into action and traveled to Syria to join ISIS. Upon arriving in Syria, Ramic completed an ISIS intake form, indicating that he wished to become a fighter. To prepare for battle, Ramic went through military-style training where he learned warfare tactics and how to use combat weapons. His classmates recalled that he expressed a particular interest in automatic weapons and sniper rifles.

After completing his training, Ramic fought in the siege of Kobane, a city in northern Syria. He was on the front lines of the initial assault on the city. During this battle, ISIS primarily fought against a local militia group. But the United States also supported that local militia, launching air strikes against ISIS forces. Though the attack was ultimately unsuccessful, ISIS wreaked enormous havoc on the city and its populace, displacing hundreds of thousands of civilians and committing numerous atrocities. Roughly 100,000 people died during the campaign.

Following the siege of Kobane, Ramic continued to support ISIS's mission. He posted on social media, praising ISIS's public beheading of Coptic Christians in Libya, boasting about how many bodies he could fit in the back of a car, and bragging that he had "slave girls" cleaning his house. R. 326, Pg. ID 5462.

Ramic also told a friend that he wanted to become a martyr for ISIS. He would've followed through with that goal, but ISIS made martyrs wait for approximately six months before launching their suicide missions. That wait was simply too long for Ramic, who became frustrated and abandoned that goal.

Eventually, Ramic became disillusioned with ISIS. He was disappointed that it didn't "apply[] Islamic principles" strictly enough and that the people he met in Syria "did not practice the Muslim faith at all." R. 291-1, Pg. ID 4420, 4423. So he decided to abandon ISIS and travel to Turkey instead.

Once Ramic entered Turkey, Turkish authorities arrested him for engaging in terrorism. After holding him in custody for five years, Turkish authorities turned Ramic over to the United States. A grand jury in the Western District of Kentucky then charged him with conspiring to provide and providing material support to a foreign terrorist organization and receiving military-

type training from such an organization. Ramic went to trial, and a jury convicted him of all charges. The district court calculated Ramic's advisory Guidelines range as 360 to 600 months' imprisonment. But the district court sentenced Ramic to just 101 months' imprisonment—72 percent below the bottom of the Guidelines range.

The district court attempted to justify its sentence in two primary ways. First, it stated that Ramic didn't engage "in any acts of terrorism as . . . in a more common sense" understanding of the term. R. 311, Pg. ID 4785. It explained, for example, that Ramic hadn't engaged in any "random acts of violence directed at innocent populations," detonated any "bombs," or inflicted any "horrible incidents of gun violence against crowds." *Id.* Instead, the district court concluded that Ramic was merely a "fighter" and a "soldier" who joined "a standard army" that wanted to "require strict adherence to [Islamic] law." *Id.* Second, the district court noted that the median sentence for terrorism defendants with the same offense level and criminal-history category was only 168 months' imprisonment. Using that median sentence as a starting point, the district court subtracted the 67 months that Ramic spent in Turkish custody and arrived at a final sentence of 101 months.

Ramic timely appealed, challenging the district court's calculation of his Guidelines range. And the government timely cross-appealed, challenging the length of Ramic's sentence.

II.

Ramic argues that his sentence is procedurally unreasonable because the district court incorrectly calculated his Guidelines range. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Specifically, he contends that the district court improperly applied a sentencing enhancement for terrorism offenses. *See* U.S.S.G. § 3A1.4. We review the district court's legal interpretation of the terrorism enhancement de novo and its factual findings for clear error. *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014).

The terrorism enhancement applies to any "felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. And the Guidelines define a "federal crime of terrorism" by reference to 18 U.S.C. § 2332b(g)(5). *Id.* § 3A1.4 cmt. n.1. That statute provides that a federal crime of terrorism "is calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5).

Ramic argues that the term "government" includes only governments that the President has recognized.  He then contends that condition isn't satisfied here because ISIS fought against only the Kurdistan Workers' Party, which is a nonstate actor, and the Assad regime, which wasn't the recognized government of Syria.  But that argument fails.

Neither the terrorism statute nor the Sentencing Guidelines defines the term "government."  So we rely on its ordinary meaning.  *See Perrin v. United States*, 444 U.S. 37, 42 (1979); *see also United States v. Ansberry*, 976 F.3d 1108, 1128 & n.11 (10th Cir. 2020) (defining "government" for purposes of the terrorism enhancement using ordinary dictionary definitions).  The ordinary meaning of "government" refers to "the body of persons that constitutes the governing authority of a political unit or organization."  *Government*, *Webster's Third New International Dictionary* (1961); *see also Government*, *Oxford English Dictionary* (2d ed. 1989) ("The governing power in a state; the body of persons charged with the duty of governing."); *Government*, *Black's Law Dictionary* (6th ed. 1990) ("[T]he framework of political institutions, departments, and offices, by means of which the executive, judicial, legislative, and administrative business of the state is carried on.").  Notice what's missing:  Those definitions aren't limited to governments that the United States has formally recognized.

If Congress wanted to use a specialized definition of the term "government," it could have done so.  *See Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 429 (2022).  In fact, Congress has used specialized definitions for *other* terms in the terrorism statutes.  *See, e.g.*, 18 U.S.C. § 2332f(e)(12) (defining "state" as having "the same meaning as that term has under international law").  So Congress's choice not to include a specific definition of "government" in § 2332b indicates that the term carries its ordinary meaning.

Ramic doesn't contest that the Assad regime falls within the ordinary meaning of "government."  Instead, he makes a constitutional argument:  Only the President has the authority to recognize foreign governments, and the President didn't recognize the Assad regime as the legitimate government of Syria when Ramic joined ISIS.  To be sure, the President has the

"exclusive power" to recognize foreign governments. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015). But the Supreme Court has made clear that "[t]he Executive's exclusive power extends *no further* than his formal recognition determination." *Id.* at 30 (emphasis added). That means Congress can still legislate pursuant to its own powers, which include the power "[t]o define and punish . . . Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10; *see Zivotofsky*, 576 U.S. at 16. And that's precisely what Congress did when it defined a federal crime of terrorism as conduct directed at a government, regardless of whether the United States has recognized that government. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 301, 110 Stat. 1214, 1247. In short, the President's "narrow" slice of exclusive power over recognition leaves Congress with plenty of room to craft a definition of terrorism that relies on the ordinary meaning of government.

In response, Ramic says that even if Congress didn't explicitly infringe on the President's recognition power, applying the terrorism enhancement here would implicitly recognize the Assad regime as the government of Syria, thus contradicting the President. But recognition generally requires express, unambiguous statements or a narrow subset of formal diplomatic actions. *See Zivotofsky*, 576 U.S. at 11. Those actions include issuing an official declaration, entering a treaty with the other government, and sending or receiving ambassadors. *See id.* at 11–12; *see also* Restatement (Third) of Foreign Relations Law of the United States § 204 rptr. n.2 (Am. L. Inst. 1987). In other words, determining that an entity falls within the ordinary meaning of government doesn't count as formal recognition. As a result, a court's decision that an entity is a government under § 2332b doesn't change whether the United States formally recognizes that government. Nor does it compel the Executive Branch to take any diplomatic action. So it doesn't step on the President's toes. That means the district court didn't err by concluding that Ramic's conduct directed at the Assad regime justified applying the terrorism enhancement.

But even if the Assad regime didn't count as a government under § 2332b, the terrorism enhancement would still apply here. That's because Ramic's conduct was also calculated to influence or affect the United States.[1] Before Ramic joined ISIS, the group had declared war on the United States and issued religious decrees encouraging its supporters to attack American interests. Courts have therefore recognized that "ISIS's terrorist acts are intended to intimidate or coerce the United States," so a defendant's provision of material support to ISIS is evidence that he sought to influence the United States. *United States v. Khan*, 938 F.3d 713, 719 (5th Cir. 2019).

In fact, Ramic openly embraced ISIS's mission to target the United States. For example, he posted on social media that he hoped President Obama's teenage daughters would one day be sold as ISIS slaves. *Cf. United States v. Van Haften*, 881 F.3d 543, 544–45 (7th Cir. 2018) (applying the terrorism enhancement to an ISIS supporter who posted on social media that he wanted to see President Bush's and President Obama's children and grandchildren "sold as slaves at [ISIS] markets"). Ramic also posted a picture of a brochure given to the families of American soldiers who died in combat next to a picture of assault rifles. Alongside those pictures, Ramic wrote that he wanted "[t]o make more of them fall"—that is, to kill more American soldiers. R. 326, Pg. ID 5451. So Ramic's own words make clear that his support of ISIS was calculated to affect the United States.

What's more, the evidence at trial indicated that Ramic fought against American forces in the siege of Kobane. During the early stages of the battle, Ramic posted on social media that "planes [were] circling and drones hovering." *Id.* at 5460. Later that same day, he posted about the difference in diameter between the holes left by American bombs and those left by the Assad regime's bombs. An expert witness also testified that the United States launched air strikes

---

[1]Ramic argues that the government either waived or forfeited this argument because it didn't object to a passage in the presentence investigation report (PSR) stating that ISIS fought against the Assad regime and the Kurdistan Workers' Party. But this argument fails. First, that paragraph was accurate, and the government had no obligation to object. Importantly, the paragraph didn't say that ISIS was fighting against *only* the Assad regime and the Kurdistan Workers' Party. Indeed, other sections of the PSR indicated that ISIS was fighting against the United States, too. Second, the government argued in its sentencing memorandum that the district court could apply the enhancement based on Ramic's conduct targeted at the United States. And even if that weren't enough to preserve the argument, the government was the prevailing party on this issue, so it can rely on any ground in the record to support the judgment below. *Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970).

against ISIS forces at Kobane. This evidence demonstrates that Ramic knowingly battled American forces during the siege of Kobane.

In sum, the government established by a preponderance of the evidence that Ramic's conduct was calculated to influence or affect not only the Assad regime but also the United States. As a result, the district court didn't err in applying the terrorism enhancement, and Ramic's sentence wasn't procedurally unreasonable.

## III.

The government also cross-appealed, arguing that Ramic's sentence is substantively unreasonable because it's too low. A sentence is substantively unreasonable if "the court placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). Here, the district court didn't adequately weigh the seriousness of Ramic's crime, potential sentencing disparities, and the need to protect the public.

When a district court imposes a below-Guidelines sentence, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. So a larger variance requires a more compelling rationale. *Id.* Because the district court's rationale here didn't justify such a drastic downward variance, we conclude that Ramic's sentence is substantively unreasonable.

## A.

For starters, the district court minimized the seriousness of Ramic's conduct. This led the district court to impose a sentence that didn't reflect the "seriousness of the harm" caused by Ramic's terrorism offenses. *United States v. Boucher*, 937 F.3d 702, 710 (6th Cir. 2019) (quotation omitted). And that makes Ramic's sentence substantively unreasonable.

Throughout sentencing, the district court downplayed ISIS's mission and Ramic's actions. It described Ramic's conduct as "participation in an organized army intent on capturing a piece of territory for the creation of their own state." R. 311, Pg. ID 4786. And it repeatedly characterized Ramic as a "soldier" and "fighter" who merely "went to join an army." *Id.* at

4785–86.  But Ramic was no ordinary soldier.  That's because ISIS isn't an army governed by the laws of war or a code of ethics like our armed forces.  It's a terrorist group that has engaged in countless atrocities.  *See United States v. Khan*, 997 F.3d 242, 248 (5th Cir. 2021) (finding a sentence substantively unreasonable when the district court compared a prospective ISIS fighter to someone "signing up for the Marines").

And if there were any doubt about ISIS's brutality, the government proved it at trial.  First, the government established that ISIS carried out a large suicide attack at a mosque in Kuwait.  Then, ISIS targeted Belgium, where a member began shooting inside a museum, murdering four people.  Around the same time, ISIS executed 700 cadets at a military school in Iraq, killing one young soldier after another.  And the following year, ISIS publicly beheaded 21 Coptic Christians simply because those innocent civilians dared to practice their faith.

What's more, the government showed that Ramic embraced ISIS's radical beliefs and atrocities.  On social media, he hoped for the day when President Obama's daughters would "be sold as [slaves] in one of the local markets."  R. 299, Pg. ID 4558.  He threatened the "rafidah/shia" Muslims that they must convert to Sunni Islam "or Die."  *Id.* at 4561.  He posted a photo of a United States "fallen veterans" brochure alongside an ISIS flag and rifles and asked others if they were "ready for a joint mission" to "make more [U.S. soldiers] fall."  R. 326, Pg. ID 5450–51.  And he celebrated the beheadings of the Coptic Christians:  "If [J]esus was alive today he would be with Islamic State, and behead #Copts for taking him as god besides Allah."  R. 299, Pg. ID 4560.  The district court, however, failed to address these posts in determining the seriousness of Ramic's offense.  *See United States v. Medlin*, 65 F.4th 326, 331 (6th Cir. 2023).

The district court's characterization of ISIS (and Ramic's support for its cause) matters because Ramic was convicted of providing material support to a terrorist group.  So the court needed to consider the nature of the terrorist group Ramic supported to properly evaluate the seriousness of his offense.  *See Khan*, 997 F.3d at 248 (finding a sentence substantively unreasonable when the district court "failed to acknowledge that [the defendant] had facilitated and fully supported the purposes and atrocities of ISIS").  In other words, the more violent and brutal the terrorist organization, the more serious it is to provide material support to that group.  In this case, Ramic intended to help ISIS gain power and territory so that it could wage a global

jihad.  Plus, Ramic's participation meant that ISIS needed one fewer fighter on the battlefield in Syria and could instead afford to send its members to commit terrorist attacks around the world.  The district court's failure to grapple with ISIS's brutalities or recognize how Ramic's efforts facilitated those atrocities caused it to understate the seriousness of his crimes.

The district court also stated that Ramic's actions didn't involve "any acts of senseless violence against innocent people."  R. 311, Pg. ID 4785.  But that ignores the district court's own factual findings.  The district court adopted the PSR without change.  The PSR explicitly noted that the siege of Kobane—which Ramic participated in—led to the displacement of hundreds of thousands of civilians and the deaths of about 100,000 people.  The PSR further explained that ISIS engaged in atrocities against civilians in the area.  Granted, there's no specific evidence about what Ramic did during the siege.  But we know that his participation in the siege of Kobane supported ISIS's commission of brutalities.  And we know that he abused civilians by forcing "slave girls" to clean his house.  R. 323, Pg. ID 5258.  So the record—including the district court's own factual findings—undermines the court's assertion that Ramic's conduct didn't involve "senseless violence" against civilians.

Finally, the district court downplayed Ramic's crimes by claiming that he didn't engage "in any acts of terrorism . . . in a more common sense" understanding of that term.  R. 311, Pg. ID 4785.  Specifically, the district court emphasized that "[t]here were no bombs" or "horrible incidents of gun violence against crowds."  *Id.*  First, we don't know whether that's true—ISIS regularly targeted civilians with bombs and guns.  Second, even though there's no specific evidence that Ramic engaged in such conduct, the district court's rationale still doesn't justify such a substantial downward variance.  *See Gall*, 552 U.S. at 50.  A district court must ensure that a sentence "meshes with Congress's own view of the crime['s] seriousness."  *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (cleaned up).  And Congress adopted a broader definition of material support that extends beyond just launching bombs or shooting into a crowd.  *See* 18 U.S.C. § 2339A(b)(1) (defining "material support" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel . . . , and transportation"). By fixating on its own unduly narrow conception of terrorism, the district court ignored its obligation to craft a sentence that reflects Congress's broader view of that crime.

Combined, these mistakes led the district court to impose an unduly lenient sentence that doesn't reflect the seriousness of Ramic's offenses.

B.

In addition to understating the seriousness of Ramic's conduct, the district court placed too much weight on national sentencing data. The district court started with the median sentence for terrorism defendants with the same criminal-history category and offense level as Ramic, which was 168 months. It then subtracted 67 months for the time Ramic spent in Turkish custody and arrived at a final sentence of 101 months' imprisonment.

It's true that a district court must consider whether a sentence will create unwarranted disparities among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). But a district court accounts for those disparities by correctly calculating a defendant's Guidelines range. *United States v. Hymes*, 19 F.4th 928, 935 (6th Cir. 2021). And while a district court may consider national statistics to evaluate potential sentencing disparities, district courts may not "elevate the Commission's statistical data over the text of the Guidelines themselves." *Id.* at 936. That's because it is the role of the Sentencing Commission—not district courts—to update the Guidelines in response to new empirical data. *Id.* Plus, sentencing statistics have important limitations that can prevent district courts from making meaningful comparisons between cases. For example, the data may be "so general that it often is difficult to know whether offenders grouped into the same primary offense category have indeed been found guilty of similar conduct." *United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012) (cleaned up). In short, even though national sentencing statistics can sometimes provide helpful information, they can't displace the Sentencing Guidelines as the principal measure of whether a sentence would produce unwarranted disparities.

Here, the district court allowed national statistics to control its sentencing decision and failed to justify that decision. The district court started with the median sentence for similarly

situated offenders, even though it admitted it didn't "have a whole lot of texture to what these other defendants did." R. 311, Pg. ID 4786. Without any comparison to other defendants, it asserted that it "tend[ed] to view this more along the median of 168 months." *Id.* And in doing so, the district court ignored significant gaps in the sentencing data. First, the relevant sample size included only nine other defendants. So it's possible the data was skewed by one or two outlier cases. Second, the bare sentencing data didn't explain the severity of the other defendants' crimes, specify whether they accepted responsibility, or indicate whether they had been rehabilitated. Despite the lack of these key details, the district court still somehow determined that Ramic's conduct was "along the median of 168 months." *Id.* But without more information, the district court had little basis to conclude that Ramic was similarly situated to those other defendants. Did they travel to Syria and actually fight in a war? Did they boast about their activities and their hatred for America? We don't know.

Indeed, compared to other defendants who engaged in conduct like Ramic's, his sentence is shockingly low. Courts have regularly imposed far longer sentences for defendants convicted of providing material support to ISIS.[2] And many of those defendants' conduct was much less egregious than Ramic's. Some didn't make it out of the country or reach the battlefield.[3] Others provided small sums of money to support ISIS's goals but received more jail time than Ramic.[4] Contrast those defendants with Ramic, who actively participated in an attack that claimed the

---

[2]*See, e.g.*, *United States v. Carpenter*, 157 F.4th 841, 846, 855 (6th Cir. 2025) (240 months for defendant who merely provided translation services for ISIS); *United States v. Rahim*, 860 F. App'x 47, 49–50 (5th Cir. 2021) (per curiam) (360 months for defendant who ran ISIS social-media channel and encouraged individuals to join ISIS); *United States v. Langhorne*, No. 22-12412, 2024 WL 2018545, at *1 (11th Cir. May 7, 2024) (per curiam) (240 months for defendant who produced a video for ISIS on how to make a bomb); *United States v. Blanco*, 102 F.4th 1153, 1157–58 (11th Cir. 2024) (192 months for defendant who ran two unofficial ISIS social-media channels); *United States v. Khweis*, No. 22-4406, 2023 WL 4993685, at *1 (4th Cir. Aug. 8, 2023) (168 months for defendant who provided administrative support to ISIS).

[3]*See, e.g.*, *United States v. Alebbini*, 979 F.3d 537, 539, 543 (6th Cir. 2020) (180 months for defendant who attempted to travel to Syria to join ISIS but was arrested at the airport); *United States v. Masood*, 133 F.4th 799, 803–04 (8th Cir. 2025) (216 months for defendant who attempted to travel to ISIS-controlled territory but was arrested at the airport); *see also* R. 299, Pg. ID 4575 (240 months for defendant who traveled to join ISIS but was arrested before reaching ISIS-controlled territory).

[4]*See, e.g.*, *United States v. Young*, 818 F. App'x 185, 188–89 (4th Cir. 2020) (per curiam) (180 months for defendant who advised someone on how to join ISIS and sent him $245); *United States v. Khusanov*, No. 25-14, 2026 WL 21000, at *1 (2d Cir. Jan. 5, 2026) (132 months for defendant who provided between $200 and $400 to fund another individual's travel to join ISIS).

lives of over 100,000 people.  Far from avoiding sentencing disparities, the district court created a disparity by imposing a sentence on Ramic that was lower than what other ISIS supporters received.

C.

The district court also failed to properly weigh the need to protect the public from Ramic's potential future crimes.  *See* 18 U.S.C. § 3553(a)(2)(C).  Terrorism poses "a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal," so "terrorists and their supporters should be incapacitated for a longer period of time."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).  Indeed, empirical research on Americans who traveled to join jihadist groups in Syria and Iraq supports these observations.  Even after returning to the United States, those individuals still pose a threat because they can support local jihadist networks, share their knowledge on how to conduct terrorist attacks, and recruit new members.  Alexander Meleagrou-Hitchens, Seamus Hughes & Bennett Clifford, *The Travelers: American Jihadists in Syria and Iraq* 2 (Feb. 2018).  But the district court didn't even mention the possibility that Ramic could pose such a risk after his release.

In fact, there are strong reasons to be concerned that Ramic will return to terrorist activities after serving his prison sentence.  First, under the district court's sentence, Ramic would be released at age 39, so he would still be capable of launching future attacks.  *See United States v. Ressam*, 679 F.3d 1069, 1090 (9th Cir. 2012) (noting that a defendant released at age 51 would be "sufficiently active and capable . . . to do considerable damage" especially in light of his "strongly held beliefs" and "willingness to attack American interests").  Second, Ramic received military-type training from ISIS.  That means he's "far more sophisticated than an individual convicted of an ordinary street crime" and thus "poses a heightened risk of future dangerousness."  *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011).  The district court should have accounted for both of these risks.

Perhaps most importantly, Ramic hasn't disavowed terrorism. He left ISIS not because he disagreed with the group's mission or its brutal tactics, but because he believed ISIS was corrupt. And his failure to renounce terrorism means it's possible that he would join another terrorist organization in the future.

Plus, Ramic hasn't demonstrated remorse or accepted responsibility for his crimes. At sentencing, he delivered a lengthy monologue, stretching over 11 pages of the sentencing transcript, in which he lambasted the case against him. Ramic insisted that he was "an innocent man" and that he "completely reject[ed]" the charges against him. R. 311, Pg. ID 4772. He claimed it was a "sham prosecution from the start" that was "brought by biased, prejudiced, . . . rogue[,] and corrupt prosecutors . . . with a compromised grand jury." *Id.* Ramic's belief that he did absolutely nothing wrong is yet another indication that he may return to terrorism upon his release. And he may now have an additional motive to attack the United States after serving a prison sentence for what he believes was a "sham prosecution." *Id.* Once again, the district court didn't address Ramic's lack of remorse and potential future threat to the public.

These concerns about Ramic returning to terrorism upon his release aren't merely hypothetical. Courts' refusals to incapacitate terrorists for a long period of time have had deadly consequences. *See, e.g.*, Katrin Bennhold, Melissa Eddy & Christopher F. Schuetze, *Vienna Reels From a Rare Terrorist Attack*, N.Y. Times (Oct. 9, 2021) (describing a terrorist who was sentenced to just 22 months in prison for traveling to join ISIS, was released after one year, and then launched an attack in Vienna that killed four people and wounded another 23); Sadie Gurman, *Old Dominion Shooting Suspect Had ISIS Conviction, Was Subdued by Students*, Wall St. J. (Mar. 12, 2026, at 19:00 ET) (describing a terrorist who provided material support to ISIS, received a sentence far below the Guidelines range, was released, and then opened fire in a university classroom, killing the instructor and wounding two others). The district court here repeated that mistake and didn't reckon with the very real possibility that Ramic could participate in future attacks after his release. When sentencing terrorists, protecting the public is of primary importance. The district court's failure to properly weigh this factor when dealing with Ramic makes his sentence substantively unreasonable.

\* \* \*

For the foregoing reasons, we vacate Ramic's sentence and remand for resentencing consistent with this opinion.